# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

BRENDA J. WANSERSKI,

   **Plaintiff,**

  *vs.*            **CAUSE NO. 1:14-cv-1033-DKL-JMS**

**CAROLYN W. COLVIN, Commissioner of Social Security,**

   **Defendant.**

## ENTRY

   Plaintiff Brenda Wanserski applied for disability insurance benefits, supplemental security income, and a period of disability under the Social Security Act. The defendant Commissioner of Social Security denied her applications and she brought this suit for judicial review of those denials.

## Standards

  Judicial review of the Commissioner's factual findings is deferential: courts must affirm if her findings are supported by substantial evidence in the record. 42 U.S.C. ' 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758

1

(7th Cir. 2004).  This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations.  Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.  Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.  While review of the Commissioner=s factual findings is deferential, review of her legal conclusions is *de novo*.  *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. ' 416.905(a).  A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or

whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). 20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966. The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process. 42 U.S.C. ' § 423(d)(2)(B) and 1382c(a)(3)(G). 20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further. At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the applicant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling. 20 C.F.R. ' 404.1525. If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related

3

physical and mental limitations and is categorized as sedentary, light, medium, or heavy, together with any additional non-exertional restrictions.   At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled.  Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy.  42 U.S.C. ' 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.   The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled.  If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level.   Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics.  *Lee v.*

4

*Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist.  If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts.  If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1]  An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision.  If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review.  42 U.S.C. ' 405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

## Background

Ms. Wanserski applied for benefits in July 2011 and alleged that she became disabled in December 2011.  The ALJ found that she met the insured status requirement

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q (' 404.1601, *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

for DIB and a period of disability through December 31, 2015.  At step one of the sequential evaluation process, the ALJ found that she had not engaged in substantial gainful activity since her alleged disability onset date.

At step two, the ALJ found that Ms. Wanserski had the severe impairments of degenerative disc disease and migraine headaches.  She found that Ms. Wanserski has the non-severe impairments of a mood disorder, mild right carpal-tunnel syndrome with epicondylitis, chronic rhinitis, hyerlipidemia, hypertension, gastro-esophageal reflux disease, and ulcerative colitis.  She found that Ms. Wanserski does not have the alleged impairments of fibromyalgia, depression, anxiety, decreased visual acuity, tendonitis (defuse), syncope/vertigo/lightheadedness, and a hip disorder.  At step three, she found that Ms. Wanserski did not have an impairment or combination of impairments that meet or medically equal any of the listing of impairments.  She examined listing 1.04 (disorders of the spine) and all of category 11.00 (neurological conditions).

For the purposes of steps four and five, the ALJ determined Ms. Wanserski's RFC. She found that Ms. Wanserski has the capacity to perform light work except for the following restrictions: no more than frequent climbing ramps, stairs, ladders, ropes, and scaffolds; frequent balancing and stooping; frequent reaching in all directions, bilaterally; [2] occasional kneeling, crouching, and/or crawling; and occasional overhead

---

[2] The ALJ wrote that Ms. Wanserski has the RFC for light work "except the claimant can only frequently climb ramps, stairs, ladders, ropes, and/or scaffolds, balance, stoop, but she is limited to occasional kneeling, crouching, and/or crawling.  The claimant is further limited to frequent reaching in all directions, bilaterally, except overhead lifting which is further limited to occasional, bilaterally."  (R. 30.) "Frequently" is the highest level of limitation used by the Social Security Administration for rating a

lifting.  (*Id.*)  (R. 30.)   As noted below, the ALJ also found that Ms. Wanserski had fine and gross manipulation limitations.

At step four, the ALJ determined that this RFC renders Ms. Wanserski unable to perform any of her past relevant work.  For step five, the ALJ determined that, at the time of the hearing, Ms. Wanserski was fifty years old, classified as "an individual closely approaching advanced age;" she has at least a high-school education and is able to communicate in English; and the transferability of her job skills is not material to the determination of disability.  The grids would produce a finding of "not disabled" according to these factors.  However, finding that Ms. Wanserski's additional restrictions prevent her performing the full range of light work, the ALJ obtained the testimony of a vocational expert at the hearing.  Based on his testimony, the ALJ determined that a significant number of jobs exist in the national economy that Ms. Wanserski can perform and, therefore, that she is not disabled.

The Commissioner's Appeals Council denied Ms. Wanserski's request to review the ALJ's decision, which rendered the  ALJ's decision the final decision of the Social Security Administration on her claims for benefits and the decision that the Court reviews.

---

claimants functional capacity.  *See, Physical Residual Functional Capacity Assessment* form.  (R. 475.) "Frequently" means "occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous)," and "occasionally" means "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)."  (*Id.*)  The ALJ's limitation means that Ms. Wanserski cannot "constantly" climb ramps, stairs, ladders, ropes, and/or scaffolds, balance, stoop, or reach in all directions, bilaterally.

**Discussion**

Ms. Wanserski asserts five errors by the ALJ.

**1. Failure to address migraine headaches in RFC assessment.**  Although the ALJ found Ms. Wanserski's migraines to be a severe impairment, the ALJ did not articulate a separate, focused evaluation of its impact on her RFC.  Rather, scattered throughout her survey of the record are her comments on items of evidence pertaining to Ms. Wanserski's migraines and headaches.  She also gave weight to medical opinions that did not find Ms. Wanserki's migraines to be disabling.  The ALJ did not explicitly tie any RFC restriction or absence of restriction, or her exertional work level, to Ms. Wanserski's migraines and she argues that this was error.

Ms. Wanserski cites record evidence showing her continued complaints of and treatments for headaches; her physicians increasing the dosage of and changing her headache medications, with "little apparent success;" and complaints of daily headaches with two or three a week being so severe as to prevent engaging in the most basic activities.  She argues that this evidence required specific address and analysis by the ALJ.

The ALJ noted Ms. Wanserski's allegations that she suffers daily painful, severe headaches that are photo- and phono-phobic, (R. 30*ff.*), and that she was diagnosed with migraine headaches and treated with medications, (R. 31).  The ALJ concluded that her allegations of headache symptoms and resulting functional limitations are not "accepted as alleged" because they "are not consistent with the available objective medical

evidence." (R. 31.) The ALJ then made several apparently evaluative comments on the evidence to show this lack of objective support. **First**, she noted that a head scan revealed no "abnormal sequelae" and, because no diagnostic data substantiated Ms. Wanserski's headaches, she was started on low-dose medications. (R. 31.) **Second**, the ALJ noted that, despite Ms. Wanserski's allegations that she has been disabled since late 2010 due to headaches and back limitations, her physical-therapy records include no notation regarding either condition and "other records" have no clinical evidence of significant symptom exacerbation. (R. 32). **Third**, the ALJ noted throughout her decision, that, despite Ms. Wanserski's reports of ongoing severe headaches, medical reports of examinations record that she appeared in no acute distress or not acutely ill; she was comfortable, pleasant, and cooperative; no abnormalities were found; she was well-groomed and well-nourished; and she had no mental deficits (*e.g.*, she was alert; oriented to persons, places, and time; able to follow complex commands); all of which the ALJ found was inconsistent with Ms. Wanserksi's allegations of ongoing total disability. (R. 32, 33, 33-34, 34.)[3] **Fourth**, the ALJ found that Ms. Wanserski's allegation that she "cannot stand noise or light," was not supported by the objective record. (R. 34-35.)

In addition to her general credibility comments, the ALJ made comments that are, or could be, directed specifically to the credibility of Ms. Wanserski's headache allegations. For example, the ALJ noted that, in August 2011, she reported to her

---

[3] The ALJ specifically found that Ms. Wanserski's lack of "acute distress," her cooperation, her well-groomed appearance, and her mental qualities of being alert and oriented to persons, places, and time were "very inconsistent with the assessment that the claimant could not work." (R. 33.)

physician that her previous medications were not helping, and that the only medication that did help was Ultram, which, in the ALJ's judgment, "although not conclusive, suggested some drug seeking behavior, as the claimant despite endorsing daily severe headaches and back pain appeared comfortable at the exam and the physician found no abnormalities (i.e. tender points, range of movement limitations, etc.)."  (R. 33 (citation omitted).)  The ALJ also found that the difference between Ms. Wanserski's answer on her *Headache Questionnaire* that she has had migraine headaches since 1975 and her report to hospital staff in 2007 that her migraine condition started in 1994 suggested that her *Headache Questionnaire* responses were exaggerated in order to obtain benefits.  (R. 34.)

Ms. Wanserski argues three specific errors in the ALJ's comments on the evidence of her headaches.  **First**, the ALJ's observation that she was started on "low-dose" medication is not substantial because, over time, her dosages were increased, her medications were changed, and she continued to receive injection treatments, when relief was not provided.  **Second**, the ALJ's citation of the discrepancy in Ms. Wanserski's statements about the onset of her migraines (1975 or 1994) in order to discount the severity of her symptoms, which she contends became disabling in December 2010, long after either date, is illogical (the connection between an inconsistency in onset date and severity of symptoms is "difficult to fathom"), is unsupported (no basis for finding that inconsistency suggests exaggeration in order to obtain benefits), and indicates bias by the ALJ.  **Third**, similarly to the United States Court of Appeals for the Seventh Circuit's holding in *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014), the ALJ's interpretation of the

negative scan (and resulting low-dose medication prescription) as not supporting Ms. Wanserski's allegations of migraine headaches and/or their severity was erroneous because an unremarkable scan is consistent with, and, in fact, required for, a diagnosis of migraine headaches, because it eliminates other possible causes of the symptoms. In addition, Ms. Wanserski argues that the ALJ's interpretation of the scan was a medical judgment for which she was not qualified, as demonstrated by the fact that her judgment was wrong.

In response, the Commissioner argues that the ALJ properly found that, while Ms. Wanserski's migraine headaches are severe, the objective evidence and the conservative treatment she received do not support her alleged resulting disabling symptoms. The Commissioner contends that the ALJ relied on the following evidence of inconsistent objective evidence: **(1)** Ms. Wanserski was started on low-dose medication; **(2)** her scan was normal; **(3)** 2010 treatment notes suggest no worsening of symptoms; and **(4)** she was comfortable and in no acute distress in examinations. As evidence of conservative (and lack of) treatment for migraine headaches, the Commissioner points to **(1)** sparse treatment after November 2011, and **(2)** the ALJ wrote that, in early 2012, Ms. Wanserski reported doing well and "made no complaints of symptoms consistent with her severe physical impairments," (R. 34).

The Commissioner argues that Ms. Wanserski's three specific arguments are incorrect. **First**, regarding her argument that the ALJ improperly relied on the fact that she was started on only low-dose medications — thereby contravening *Moon v. Colvin* and

disregarding later increasing dosages, changing medications, and injections — the Commissioner contends that Ms. Wanserski reads too much into the ALJ's statement. She argues that the ALJ merely accurately stated the fact that Ms. Wanserski was started on a low dose and did not draw undue conclusions therefrom, and that the ALJ relied a number of other factors (listed above) to find her allegations of symptom severity not entirely credible. **Second**, the Commissioner argues that, under her rulings, the ALJ properly drew a negative credibility inference from the significantly different dates that she gave for the onset of her migraine headaches — 1975 *vs.* 1994. See S.S.R. 96-7p ("[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). **Third**, although the Commissioner all but concedes that the ALJ erred in interpreting Ms. Wanserski's scan as objective evidence that is inconsistent with her allegations of disabling-level symptoms of migraine headaches, she argues that the error was harmless because the ALJ relied on many other factors to determine that her migraine symptoms are not as severe or debilitating as she alleged. Specifically, the Commissioner cites the 2010 treatment notes suggesting that symptoms had not exacerbated, she consistently appeared comfortable and in no acute distress during examinations, she received conservative treatment, she received sparse treatment after November 2011, and she reported doing well, with no migraine complaints, in 2012.

The Court concludes that the ALJ erred in her evaluation of the severity and resulting functional limitations of Ms. Wanserski's migraine headaches and that the error

is material.  As the Commissioner concedes, the ALJ fundamentally erred in making a medical judgment that the negative scan was inconsistent with Ms. Wanserski's allegations,[4] but the Court is not persuaded that the error was harmless.  The Commissioner does not rely on the ALJ's note that Ms. Wanserski was started on low-dose medication and that fact offers little, if any, support in light of her subsequent history of increasing treatment regimens, including increased dosages, changed medications, and injections.  The Commissioner cites the ALJ's notation that "a review of the other records" — presumably, records other than the physical-therapy records to which she just referred — "included no clinical evidence of significant symptoms exacerbation."  (R. 32.) Because the ALJ was addressing evidence of both Ms. Wanserski's headaches and "back limitations," it is unknown whether she expected evidence of exacerbated migraine symptoms to support Ms. Wanserski's allegations.  Nonetheless, the ALJ did not cite, and the Court did not discover, any medical evidence or medical opinion in the record to the effect that migraine symptoms are expected to worsen over the course of a year or longer if the symptoms are genuine or of disabling severity.

---

[4] The Commissioner was correct to concede the error, regardless of the ALJ making a medical judgment for which she was not qualified.  Because the ALJ had already found that Ms. Wanserski had the impairment of migraine headaches, she could not have interpreted the scan as inconsistent with the existence of the impairment; rather, she could have interpreted it as inconsistent with only the degree of Ms. Wanserski's alleged symptoms.  However, the Commissioner's rules recognize that there are no objective medical tests or findings for the degree of symptoms.  20 C.F.R. § 404.1529; S.S.R. 96-7p.  Although objective evidence can show physical signs that tend to confirm the existence or degree of alleged symptoms (*e.g.*, muscle atrophy in an unused or less-used painful limb), neither the ALJ nor a medical source explained what sign was absent in the MRI that would have confirmed the degree of Ms. Wanserski's migraine headaches.

Without such a medical basis, the ALJ's reliance on the absence of exacerbation is not supported by substantial evidence.

The Commissioner also cites the ALJ's reliance, throughout her decision, on record notations that Ms. Wanserski appeared comfortable and in no acute distress during examinations. Again, because the notations were made in the context of examinations for both Ms. Wanserski's back and migraine impairments, it is not clear how much the ALJ relied on the notations for assessing Ms. Wanserski's migraine headaches. In addition, the Court agrees with Ms. Wanserski that the ALJ read too much into the notations that she did not appear to be in acute distress. "Acute" refers to a disease, health effect, or symptom having a sudden, abrupt onset and a short, but severe, course, as opposed to a chronic condition or symptom having a slow development and a protracted but mild course.[5] Ms. Wanserski cites to another definition: "To physicians, 'No Acute Distress' means that your patient will probably not become unstable in the next 5 minutes."[6] Without an explanation of what the recording medical professionals meant by "no acute distress," it cannot be simply assumed, as the ALJ did, that they meant that Ms. Wanserski did not experience migraine-headache pain to the degree that

---

[5] J. E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder*, p. A-106.1 ("acute") (2014); *Stedman's Medical Dictionary, 28th Edition*, p. 23 ("acute") (2006); *Dorland's Illustrated Medical Dictionary, 32nd Edition*, p. 25 ("acute") (2012); American Medical Association, *Complete Medical Encyclopedia*, p. 116 ("acute") (2003).

[6] Dave Chauvin, D.O., and Lisa Hohler, C.P.C., "Physician Documentation — No Acute Distress," Premier Physician Services website (http://www.premierdocs.com/about-us/news/2013-02-14-physician-documentation-no-acute-distress) (viewed Sept. 22, 2015).

she alleged.  Further, although Ms. Wanserski alleged at times that she has constant headaches, she did not allege that they are always of disabling severity; thus, the fact that she was not in apparent acute distress at the times of certain examinations is insubstantial evidence that she never experiences the degree of symptoms that she alleged.  Similarly, the notations that Ms. Wanserski appeared "comfortable" during some examinations is too thin to support an inference that she does not suffer the degree of symptoms she alleges when she is experiencing a migraine headache.  For example, the ALJ did not note any indication in the cited examination records where Ms. Wanserski reported experiencing a migraine at the time.

The ALJ's comments about "conservative treatment," (R. 32 ("*conservative treatment regimen consisting of medication management only*"), 34 ("conservative medication management regimen," "treatment regimen remained very conservative"), 35 ("conservative treatment regimen")), and "rather sparse" treatment after November 2011, (R. 34), do not provide sufficient basis for the ALJ's finding that the record is inconsistent with Ms. Wanserski's allegations of disabling migraine pain.  First, only in his last-cited description of Ms. Wanserski's treatment as conservative did the ALJ express an evaluative judgment: he determined that the conservative treatment reflected in Dr. Purohit's notes was inconsistent with the doctor's opinion that Ms. Wanserski was totally disabled for any occupation.  (R. 35).  However, it is not clear that the ALJ's characterization was of Dr. Purohit's migraine treatments (if any) as conservative, as opposed to his back treatments.  To the extent that the ALJ intended to characterize Ms.

Wanserski's migraine treatments as conservative, he did not cite any expert medical opinion to that effect or expert medical opinion regarding what different or additional migraine treatments would be followed if Ms. Wanserski's symptoms are as severe and limiting as she alleged.   It appears that Ms. Wanserski was always continued on medications for her migraines throughout this period.   Second, the ALJ's comment about "rather sparse" treatments after September 2011 suffers from the same deficiencies.   It is not clear that he intended the comment to include Ms. Wanserski's migraine treatments and he cites no expert medical opinion regarding what additional treatments would be expected if her alleged degree of symptoms and limitations are true.   Without the supporting medical bases for the ALJ's reliance on the nature and frequency of treatments, his judgments are not supported by substantial evidence.

The Commissioner cites the discrepancy between Ms. Wanserski's two statements of when her migraine condition began:  in 1975, according to the *Headache Questionnaire* that she completed for her present claims, (R. 219), and in 1994, according to the report of a neurological consultation for evaluation of her migraine headaches in November 2007, (R. 324).[7]  Ms. Wanserski does not deny the discrepancy or offer an explanation for it. Rather, she argues that discounting her allegations based on the discrepancy or any inference that she exaggerated in her application for benefits is illogical because she

---

[7] The Commissioner contends that the ALJ did not rely on the discrepancy to "discount" Ms. Wanserski's subjective complaints, "but rather pursuant to the rulings, [the ALJ] properly relied on [Ms. Wanserski's] inconsistent statements as evidence that '[suggested] the claimant may have exaggerated' her application materials." (*Response*, at 17 (first two brackets added).)  The Court does not discern a material difference between discounting subjective complaints and finding them exaggerated.

alleges an onset date of December 2010:  as long as she as disabled by her onset date, the commencement of her impairment is immaterial.  She also argues that, if the ALJ found the discrepancy so important, then she should have inquired about an explanation for it, *e.g.*, whether Ms. Wanserski's memory was poor or whether she meant that the migraines began in 1975 and increased in severity in 1994.

The Commissioner also argues that, in 2012, Ms. Wanserski "was doing well with no complaints of migraines."  (*Defendant's Memorandum in Support of the Commissioner's Decision* [doc. 26] ("*Response*"), at 17.)  The Commissioner apparently refers to the ALJ's comment that, from early to mid-2012, Ms. Wanserski did not complain to Dr. Purohit, her primary-care physician, of symptoms that were consistent with her alleged severe physical impairments, and, in August 2012, she reported that she was "doing ok," (R. 521), "which is not consistent with her allegations of total ongoing disability."  (R. 34.) The last record of a headache complaint by Ms. Wanserski in Dr. Purohit's office notes is in his report of her November 2011 visit.  (R. 538 ("c/o headache all the time, joint pain all time, headache is constant more on left side.").)  In his reports of the eight visits with Ms. Wanserski thereafter, ending with her September 19, 2012 visit, Dr. Purohit does not specifically note a complaint about headaches, but migraine headaches are consistently listed under her "Past Medical History" and her three prescribed headache medications are reported as continued throughout the period, with one variation.  (R. 516-46.)  Under "History of Present Illness" in the report of the August 16, 2012 visit, Dr. Purohit has written "Constitutional:  doing ok."  (R. 521.)

Although the Court finds that the discrepancy in Ms. Wanserski reported onsets of her migraines and the absence of recorded migraine complaints to Dr. Purohit after November 2011 can indicate current exaggeration and less-than-alleged severity, these facts are not weighty enough to provide substantial evidence to support the ALJ's rejection of functional limitations due to Ms. Wanserski's migraine headaches after his other grounds are found wanting.   It is not as evident as it needs to be that Ms. Wanserski's pushing back the year that she started experiencing migraines was deliberate or that it would have materially helped her claim.   The ALJ needed to explore an explanation for the discrepancy before relying on it as a reason to discredit her statements.   The absence of recent complaints of headaches to Dr. Purohit also is not enough to support the ALJ's migraine evaluation in light of the doctor's continuation of her prescribed migraine medications, the uncertainty of the curt "doing ok" note, and the rejection of the other expressed and defended grounds for his evaluation.   Thus, even if the onset discrepancy and absence of recent complaints were substantial evidence supporting the ALJ's evaluation by themselves, they are not sufficient in the context of the rejected evidence relied upon by the ALJ.   It is not evident how much weight the ALJ gave to all of these factors in his evaluation of the severity of Ms. Wanserski's migraine symptoms or the extent of their functional impact.

The ALJ must reconsider her evaluation of Ms. Wanserski's migraine headaches and articulate her findings and conclusions in light of these findings.

**2. Credibility.**  Ms. Wanserski asserts five errors in the ALJ's general credibility determination.  **First**, Ms. Wanserski argues that, in articulating her credibility finding, the ALJ used the "boilerplate" language that the Seventh Circuit has criticized for implying that the RFC determination was made first and the claimant's credibility was evaluated against that determination, rather than the RFC determination being informed by the ALJ's assessment of the claimant's credibility.  See *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014).  However, the Court agrees with the Commissioner that the mere use of the boilerplate language is not automatically erroneous.  If an ALJ articulates grounds for her credibility determinations, use of the boilerplate will not invalidate that determination.  *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013).  In this case, the ALJ did articulate reasons for her credibility findings, regardless of their merit.  Ms. Wanserski has not shown error.

**Second**, Ms. Wanserski asserts that "the entirety of the ALJ's conclusions is based on her perceived discrepancies between the objective evidence and Plaintiff's subjective complaints" and she argues that requiring objective evidentiary confirmation of subjective symptoms is contrary to law.  (*Motion for Summary Judgment or Remand* [doc. 20] ("*Plaintiff's Brief*"), at 17-18.)  And, with that, her argument ends.  She only asserts that the ALJ required objective substantiation for her symptoms but does not develop her assertion with citations or explanation.  The Court will not develop her argument for her and, therefore, she has forfeited any argument that could have been made.

**Third**, Ms. Wanserski argues that the ALJ "extracted isolated statements to undermine Plaintiff's credibility." (*Plaintiff's Brief*, at 18.) However, because she identifies only one such extraction, the Court's review will be limited to that one, because, again, the Court will not develop her argument for her or undertake a general review of the ALJ's decision and the record. Ms. Wanserski cites the ALJ's finding that it is "very damaging" to her credibility that Ms. Wanserski indicated to one physician that she had numbness and pins and needles and tingling at both wrists and hands, (R. 381), when she had just told her physical therapist that she no longer had any ongoing upper-extremity symptomology, (R. 333-73). (R. 32 (ALJ generally cites Exhibit 6F, (R. 333-73), for Ms. Wanserski's denial of upper-extremity symptomology).) Ms. Wanserski contends that she did not tell her physical therapist that she was asymptomatic; rather, she said only that she had no pain *at rest.* She cites R. 366, but that Progress Note does not contain such a statement. It records her statement that she still has occasional sharp pain in her right elbow with use, and no pain at rest; there is no mention of her wrists and hands. Ms. Wanserski also contends that other contemporary physical-therapy notes record her reports of increased pain with increased activity and that her lifting was restricted to fifteen pounds. She cites R. 357-58, which records her report of increased pain with repetitive motion, but the occurrence is not not identified to her wrists, hands, elbows or any specific body part, and, therefore, could refer to symptoms of her back impairment.

These gaps do not matter, however, because, in her response, the Commissioner does not address Ms. Wanserski's one example of a statement that the ALJ extracted in

isolation. Instead, the Commissioner argues that Ms. Wanserski is engaged in nit-picking, rather than reading the ALJ's opinion as a whole and in a commonsensical manner, and that an ALJ is not required to discuss every piece of evidence in the record. The Commissioner argues, with citations to the decision, that the ALJ did not focus on only evidence that favored her decision, but considered all the evidence, including Ms. Wanserski's consistent treatments for migraines and her diffuse tenderness noted in examinations. By not responding to Ms. Wanserski's argument that the ALJ misread her statement to her physical therapist that she was asymptomatic, the Court finds that the Commissioner concedes that the ALJ erred.

**Fourth**, Ms. Wanserski argues that the ALJ erred in using her failure to undergo corrective release surgery for her carpal-tunnel syndrome to discredit the severity of her allegations. She argues that an ALJ may not rely on a claimant's failure to undergo prescribed or available treatments without exploring the reasons for the failure, *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014), which the ALJ did not do in this case. The Commissioner responds that, under S.S.R. 96-7p, ALJs may consider the consistency of claimants' levels and frequencies of treatment with their levels of complaints in their credibility determinations, but she does not address the ALJ's failure to explore the reasons for Ms. Wanserski's failure to have the surgery. She argues only that Ms. Wanserski does not now point to any evidence of an explanation. In addition, she argues that the ALJ considered sufficient other evidence in making his determination regarding her carpal-tunnel syndrome, such as the lack of treatment for or complaints about the

syndrome, the absence of evidence of fine or gross manipulation limitations, and the presence of full ranges of movement in her arms after the release surgery was recommended.

In her decision, the ALJ noted that, despite finding no pulsation, sensation or range-of-movement deficits, Ms. Wanserski's doctor suggested release surgery because of the "ongoing nature" of her alleged limitations.  (R. 26.)  The ALJ also noted that Ms. Wanserski did not have the surgery "which suggest[ed] that the claimant's symptoms are not as severe as alleged."  (*Id.*)  The ALJ also noted the absence of any report about carpal-tunnel syndrome after surgery was suggested; and evidence of normal grip-strengths, ranges-of-movement, and manipulation at her later consultative examination.  (*Id.*)  The ALJ also noted that her right carpal-tunnel syndrome had been diagnosed as mild; upon discharge from physical therapy, Ms. Wanserski denied further numbness and tingling and reported only intermittent sharp elbow pains; there have been no range-of-movement or strength deficits reported; in October 2010, her physical therapist released her to full-time work; repeat electromyography testing showed improvement that was consistent with mild carpal-tunnel syndrome and showed no evidence of ulnar neuropathy, cervical radiculitis, or polyneuropathy; and no further treatment was ordered.  (*Id.*)

This discussion by the ALJ of Ms. Wanserski's carpal-tunnel-syndrome impairment appeared as part of her step-two analysis, explaining why she found that the syndrome is an impairment but that it is not severe.  (R. 26.)  Errors made at step two are

harmless if the ALJ proceeds to the next steps.  *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("But even if there were a mistake at Step 2, it does not matter.  Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment.").  Because the ALJ did proceed in this case, she committed no error at step two.

However, the ALJ also wrote that, despite her finding of non-severity and the lack of evidence of medical and functional deficits, she afforded Ms. Wanserski the "maximum benefit of the doubt" in light of her hearing testimony that she has lifting and manipulation limitations and, therefore, the ALJ added limitations in her RFC finding to account for her carpal-tunnel syndrome.  (R. 26.)  Thus, the ALJ's carpal-tunnel analysis had an effect on her RFC and step-five determinations.  But the ALJ did not identify the specific RFC limitations that were added for this reason.  They must be the reaching and overhead-lifting restrictions, (R. 30, 35 (giving partial weight to the opinions of the state-agency consultants' physical assessments, the ALJ wrote that "the totality of the available evidence, including the claimant's subjective testimony, indicates that with regard to the claimant's ability to reach, she is more limited than originally assessed.")), and/or the fine or gross finger or hand manipulation limitations, (R. 30).[8]

---

[8] In her primary hypothetical at the hearing, the ALJ asked the vocational expert to assume that a person is limited to "frequent handling, fingering, and reaching on the right only . . . ."  (R. 71.)  In later hypotheticals, she asked him to assume that the person is limited to "occasional fingering on the right dominant hand . . .", (R. 73), and is limited to occasional handling or reaching with the right . . .", (*id.*).  The vocational expert testified that the parameters of the primary hypothetical would prevent the performance

Considering the ALJ's decision as a whole, the Court finds that Ms. Wanserski has not shown that the ALJ's assessment of the credibility of her allegations of carpal-tunnel-syndrome symptoms and limitations is unsupported by substantial evidence.   The Commissioner does not defend the ALJ's failure to inquire into the reasons for Ms. Wanserski not undergoing the release surgery and does not contest the law requiring such an inquiry as a prerequisite to drawing a negative credibility inference from failure to follow prescribed treatments.   She argues only that the ALJ relied on other substantial evidence showing that her symptoms are not as bad as alleged and that Ms. Wanserski does not cite any evidence explaining why she did not undergo the release surgery.   The Court agrees with the Commissioner that the ALJ relied upon sufficient other evidence to support her finding that Ms. Wanserski's carpal-tunnel symptoms and limitations are not as severe as she alleged and to support the reaching and manipulation limitations that she imposed.   The absence of complaints after the suggestion of release surgery, the normal test results (*e.g.*, grip strength, range-of-movement, manipulation), the diagnoses of her impairment as mild, her denial of numbness and tingling upon discharge from physical therapy, her release to full-time work, the repeated electromyography tests showing improvement, mild condition, and absence of neurologic conditions and

---

of past relevant work, (R. 71), but would allow the performance of a number of other jobs, (R. 71-72).  He testified that there would be no jobs existing for a person with the additional fingering, handling, and reaching restrictions (occasional) described in the ALJ's later hypotheticals.  (R. 73.)  The ALJ relied on the vocational expert's opinion of the numbers of jobs existing under her primary hypothetical to find that a significant number of jobs existed for Ms. Wanserski and, therefore, she is not disabled.  Although the ALJ thus adopted his first hypothetical's parameters, he did not include the described handling, fingering and reaching limitation in her written RFC definition.  (R. 30.)  Ms. Wanserski does not raise an issue about this discrepancy.  The Court assumes that the ALJ mistakenly omitted from her written RFC description the right-hand handling, fingering, and reaching limitations that she described to the vocational expert at the hearing.

radiculopathies, and the absence of further treatments are substantial evidence supporting the ALJ's credibility finding regarding Ms. Wanserski's statements of carpal-tunnel-symptoms and the ALJ's RFC finding and limitations, even omitting her erroneous citation of Ms. Wanserski's failure to undergo the suggested release surgery.

**Fifth**, Ms. Wanserski argues that the ALJ erred in relying on several reports that she appeared comfortable, in no acute distress, well-groomed, well-nourished, and that she was cooperative, alert and not acutely ill during examinations, in determining her general credibility. (R. 32, 33, 33-34, 34.) (The ALJ's cited reports also note that Ms. Wanserski was oriented to persons, places, and time, (*id.*), but Ms. Wanserski does not challenge those notations.) Ms. Wanserski argues that the ALJ failed to explain "how being well-groomed, nourished, alert, etc." is inconsistent with her symptom statements. She argues that the ALJ must have believed that, in order to be disabled, she must be "starving and writhing in pain." (*Plaintiff's Brief*, at 19.) The Commissioner defends the ALJ's reliance on the reports that Ms. Wanserski appeared comfortable and in no acute distress; she does not address the ALJ's citations to the notations that Ms. Wanserski was cooperative, well-groomed, well-nourished, alert, and not acutely ill. The Commissioner argues that it was reasonable, and proper under S.S.R. 96-7p, for the ALJ to consider Ms. Wanserski's "lack of distress and comfortable demeanor in examination," which is "'not what one would expect,' given her reported levels of extreme and ongoing pain." (*Response*, at 25; R. 32.)

The Court agrees with the Commissioner that an ALJ is entitled to consider a claimant's demeanor at an examination in her credibility determination, especially when the claimant, as did Ms. Wanserski, allege that she experiences constant or frequent headaches, (*e.g.*, R. 53-60).  S.S.R. 96-7p.  But that agreement goes only as far as the Commissioner goes in defense of the ALJ's decision: to the ALJ's reliance on the notations that Ms. Wanserski appeared comfortable and in no acute distress at certain examinations.  Although the Court has already noted that it is, to some degree, from unclear to unlikely that the ALJ properly interpreted the notations in the medical records that Ms. Wanserski appeared to be in "no acute distress," there is no indication that the ALJ misinterpreted the notations that Ms. Wanserski appeared "comfortable" during several examinations.  The ALJ was entitled to consider and to rely on this fact which it is reasonable to conclude is inconsistent, to some degree, with her allegations of constantly or frequently experiencing debilitating pain and other symptoms caused by her back, neck, arms, headache, and other impairments.  However, the Court agrees with Ms. Wanserski that the ALJ did not explain how the record notations that she was well-groomed, nourished, alert, and cooperative are inconsistent with her alleged symptoms, and the Commissioner does not defend the ALJ's reliance on these facts.  Because it is not clear how much weight the ALJ gave in his credibility determination to these unexplained or unsupported factors, as distinguished from Ms. Wanserski's apparent comfort, substantial evidence does not support the ALJ's reliance on Ms. Wanserski's demeanor during examinations for his credibility assessment.

**In conclusion**, the Court finds that the ALJ erred in her credibility determination in two respects:  (1) her incorrect interpretation of a discrepancy between Ms. Wanserski's contemporaneous statements to medical providers that she was asymptomatic and that she was symptomatic in both wrists and hands, and (2) her reliance on examination reports that Ms. Wanserski appeared in no acute distress, well-groomed, nourished, alert, and cooperative.   The Commissioner must reconsider her credibility determination without these errors.

**3.  Mental-impairments assessment.**  Ms. Wanserski argues that the ALJ failed to adequately consider her mental impairment and failed to consider it in combination with her physical impairments.   She correctly states that the ALJ found that her mental impairment to be not severe at step two and that the ALJ imposed no RFC restrictions attributable to her mental impairment.  Ms. Wanserski contends that that the ALJ based her decision on the examination report of Patrick D. Brophy, Ph.D., the consulting psychologist, during which Ms. Wanserski stated that she was "fully active" at the time.  Ms. Wanserski also contends that the ALJ "seemed to suggest" that her complaints of a mental impairment were not severe because she was not treated by a psychiatrist and because she stated that she was mainly limited by physical, not mental, impairments. (*Plaintiff's Brief*, at 19-20, citing the ALJ's decision at R. 27 and 28.)

In her step-two analysis of the severity of Ms. Wanserski's mental impairment, the ALJ followed the "special technique" for the evaluation of mental impairments required by 20 C.F.R. § 404.1520a, by assessing the degree of Ms. Wanserski's limitations in the

four broad functional areas of activities of daily living; social functioning; concentration, persistence, or pace; and episode of decompensation.   The findings cited by Ms. Wanserski were made by the ALJ in her assessment of Ms. Wanserski's activities of daily living.  (R. 27-28.)  She wrote that Ms. Wanserski reported to the consultative examiner (almost a year after the alleged onset date) that she continued to be "fairly active," that she did not like sitting around, and that she was independent in hygiene care, cooking, shopping, and driving.  (R. 28 (decision), 485 (consultant's report).)  The ALJ wrote that Ms. Wanserski testified that she continues to have the same abilities and that she is "limited mainly by her alleged physical limitations, not her mental state, which remained consistent with the application and appeal."  (R. 28 (decision); 46, 48, 66 (hearing).)[9]  Later in her decision, the ALJ wrote that "the claimant was seen for a mental/psychological consultative examination.  During this exam, the claimant reported that she does not like sitting around, and that she enjoys a very active lifestyle.  The claimant reported that despite the reported limitations, her ability to attend to all normal activities of daily living is unrestricted."   (R. 34 (citations to Dr. Brophy's consultative-examination report omitted).)

Ms. Wanserski argues that the ALJ erred in her assessment of her mental impairment in two ways.  **First**, evaluation of mental impairments and their functional

---

[9] It appears that it was counsel, in his opening statement at the hearing, and not Ms. Wanserski in her testimony, who made the statement that Ms. Wanserski is limited more by her physical conditions.  (R. 46 ("Your Honor, Ms. Wanserski's main medical condition revolves around physical conditions.  She does have some depression and anxiety with them that would limit her socially.").)

effects is a medical judgment and the ALJ did not have an expert medical opinion based on all the medical evidence of record.  She argues that neither the consultative examiner, Dr. Brophy, nor the state-agency reviewing psychologist, Amy S. Johnson, Ph.D., had the complete medical records when they rendered their opinions.  (R. 77 and 78 (Dr. Johnson, D.D.T. forms), 484 (Dr. Brophy, consultative report), 488 (Dr. Johnson, Psychiatric Review Technique form) (all documents created in September 2011).)  However, Ms. Wanserski does not identify or explain any later medical evidence of her mental condition that is of sufficient significance that it required supplemental medical review and opinion, and the Court will not undertake the task for her.

   **Second**, Ms. Wanserski argues that the ALJ failed to "consider Plaintiff's mental impairment in the context of her physical maladies." (*Plaintiff's Brief*, at 20-21.)  All that she offers in support, however, is the observation that Dr. Brophy, in his consultative report, diagnosed a "Mood disorder due to physical problems, with depressive features." (*Id.*; R. 487.)  How Dr. Brophy's diagnosis demonstrates that the ALJ did not consider Ms. Wanserski's impairments in combination is neither explained nor apparent.  There is no apparent indication in the ALJ's decision that she failed to consider the combined effect of all of Ms. Wanserski's impairments.  At the end of her RFC discussion, the ALJ concluded that "[i]n sum, although the claimant's impairments are severe, they do not preclude her from completing basic work related activities," (R. 35), which indicates that the ALJ considered all of Ms. Wanserski's impairments in making her determinations.

**4. Alternate sitting and standing.**  Ms. Wanserski argues that the ALJ erred by failing to discuss her reasons for not accepting her allegation that she is able to stand or sit for only 15-20 minutes before needing to switch positions due to pain in her lower back.  (*Plaintiff's Brief*, at 21.)  Ms. Wanserski cites her hearing testimony for her allegation of needing to alternate sitting and standing.  (*Id.*; R. 60-61.)  The ALJ asked the vocational expert about the effect of that restriction and the vocational expert answered that there would be no jobs for her.  (R. 72-73.)

Ms. Wanserski cites the requirement in S.S.R. 96-9p that an RFC assessment must be specific about the frequency of a claimant's need to alternate sitting and standing when such a restriction is present.  She argues that "[r]ather than explain why she felt Plaintiff did no[t] require a sit stand option, the ALJ simply ignored this entire line of evidence.  * * *  As the ALJ failed to discuss Plaintiff's need for a sit/stand option, remand is required."  (*Plaintiff's Brief*, at 22.)

The ALJ did not ignore or fail to assess Ms. Wanserski's allegation of standing and sitting limitations.  Ms. Wanserski testified at the hearing that she can stand for "15, 20 minutes", (R. 60); she can sit for "about the same; I just have to get up and down," (R. 60-61); and she might be able to walk a half block, (R. 61).  The ALJ asked the vocational expert about the effect on the number of jobs "if the person needed to alternate sitting and standing once every hour for about 10 minutes . . . ," (R. 72), and received the described answer that all jobs would be precluded.  In her decision, the ALJ specifically noted Ms. Wanserski's hearing testimony that "pain and functional limitations . . . limit

her ability to sit, stand, and walk for prolonged periods," (R. 30), and that "she is precluded from standing or walking for more than 20 minutes at a time due to pain . . . ," (R. 31).  (It is safe to assume that the ALJ intended to write "sitting" instead of "walking" because, as noted, Ms. Wanserski testified only to a fifteen- or twenty-minute limit on standing and sitting, and a half-block limit on walking, and she asked the vocational expert about only a standing and sitting limitation.)  Citing again to Ms. Wanserski's hearing testimony, the ALJ later wrote that "[t]he claimant further contended that her ability to sit, stand, and walk are all severe[ly] limited by pain . . . ," (R. 34), and referred to "the issue of the claimant's alleged inability to walk, sit, or stand as testified to," (*id.*).  The cited passages from the hearing transcript are the only testimony by Ms. Wanserski on her sitting, standing, and walking limitations.  The ALJ's decision also notes that Ms. Wanserski reported to Martha Miller, her family nurse practitioner, "an inability to sit/stand/walk for more than 30 minutes . . . ."  (R. 33, 429.)  Ms. Wanserski also relies on the report by Lowell Brown, M.D., the consultative physical examiner, in which he opined that "[t]he claimant should have the ability to sit, stand and walk 20 [minutes] in an 8hr work day with regular breaks," (R. 446; *Plaintiff's Brief*, at 22), and the ALJ specifically discussed Dr. Brown's consultative report, (R. 33).  Thus, rather than ignoring Ms. Wanserski's testimony of sitting and standing limitations, the ALJ specifically noted it.

She also articulated her evaluation and rejection of the full extent of Ms. Wanserski's alleged sitting/standing limitations.  She noted that the credibility of Ms.

Wanserski's allegations is compromised by inconsistencies with the record evidence, (R. 34), and cited the activities that Ms. Wanserski reported in her *Function Report*, (*id.*), and her unsupported report that she was taken off work due to fibromyalgia, (*id.*). The ALJ also explained that she afforded little weight to Dr. Brown's opinions of postural limitations because the doctor noted no limitations or abnormalities. (R. 33.) Therefore, the ALJ did not ignore or disregard Ms. Wanserski's allegations that she is limited to twenty minutes of sitting and standing at a time and Ms. Wanserski has not shown error.

**5. Dr. Brown's limitations.** Ms. Wanserski argues that the ALJ "failed to adequately explain why she did not include all of the limitations posed by Lowell Brown, the Consultative Examiner." (*Plaintiff's Brief*, at 22.) Lowell Brown, M.D., performed a consultative physical examination of Ms. Wanserski in August 2011. (R. 444.) Ms. Wanserski specifically points to Dr. Brown's opinions that "she should have the ability to sit, stand and walk 20 [minutes] in an 8hr work day with regular breaks;" she "could be expected to lift 10 lb;" and "[p]ostural limitations are bending, stooping, crouching, kneeling and crawling and should be avoided." (R. 446.) The ALJ's defined RFC did not include Dr. Brown's limitations:  she found that Ms. Wanserski has the RFC to perform work at the "light" level, (R. 30), which is defined as "a good deal of walking or standing, or . . . sitting most of the time" and "lifting no more no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," 20 C.F.R. § 404.1567(b), and she added postural limits of only frequent stooping and occasional kneeling, crouching, and/or crawling, (R. 30).

Ms. Wanserski argues that the ALJ "fail[ed] to resolve any of the discrepancies between Dr. Brown's opinion and her ultimate RFC finding.  Ms. Wanserski contends that the ALJ's only mention of Dr. Brown's opinions was to indicate '[w]hile the foregoing opinions' postural and exertional limitations remain consistent with the whole of the objective medical evidence . . . indicates she is more limited than originally assessed,'" [*sic*] (*Plaintiff's Brief*, at 23), and "[r]ather than address the limitations imposed by Dr. Brown, the ALJ fails to discuss them at all.  Thus, it is impossible to determine how this factored in to her RFC assessment," (*id.*).  Ms. Wanserski argues that the ALJ's denial should be reversed and remanded for failure to articulate an accurate and logical connection between the record evidence and her RFC finding.  (*Id.*)

Ms. Wanserski mistakenly identifies the ALJ's comments on the state-agency reviewers' opinions as comments on Dr. Brown's opinions.  (R. 35.)[10]  She also mistakes that the ALJ failed to discuss or address Dr. Brown's limitations.  The ALJ described and evaluated the findings of his physical consultative examination and his opinions on Ms. Wanserski's limitations.  (R. 33 (discussing Exhibit 12F, Dr. Brown's report).)  The ALJ described Ms. Wanserski's normal test results and abilities (*e.g.*, normal gait, stable station, able to bend down to tend to footwear, normal spinal range of movement, negative straight-leg-raise test, normal upper and lower extremity range of movement

---

[10] The ALJ's comments quoted by Ms. Wanserski in her argument refer to two reports:  the *Physical Residual Functional Capacity Assessment* form, (R. 475-82), which was completed by Bruce Whitley, M.D., who performed the initial reviews of Ms. Wanserski's applications for the state agency, (R. 77, 78), and the *Case Analysis*, (R. 503), which affirmed Dr. Whitley's opinions and was completed by J. Valentine Corcoran, M.D., who performed the reconsideration reviews of the applications, (R. 79, 80).

and no abnormalities, intact balance, and able to fully squat) and determined to afford little weight to Dr. Brown's defined postural limitations because no limitations or abnormalities were noted as a result of his testing, some of her abilities were inconsistent with Dr. Brown's limitations, and Dr. Brown's lifting limit of ten pounds was inconsistent with the fifteen-pound limit assessed by Ms. Wanserski's treating therapist who released her to return to work.  (*Id.*)

In addition, in her decision, the ALJ  noted other medical reports showing no extremity abnormalities, no range-of-movement limitations, and normal abilities.  (R. 31-35.)  She also addressed Ms. Wanserski's hearing testimony and the report of her treating family nurse practitioner which indicated lifting and postural limitations that are similar to those of Dr. Brown.  (R. 33 (ALJ rejects Ms. Wanserski's reports to her nurse practitioner of "an inability to sit/stand/walk for more than 30 minutes, the inability to lift more than 10 pounds," and the inability to crouch, stoop, or bend because of contradictory findings), 34 (the "alleged inability to walk, sit, or stand as testified to" is rejected because of contradictory reports of activities).)

Ms. Wanserski has not shown that the ALJ failed to discuss Dr. Brown's findings and opinions or to articulate her evaluation and rejection of those opinions and, therefore, Ms. Wanserski has not shown error by the ALJ.

**Conclusion**

The Commissioner's final decision denying Ms. Wanserski's applications for disability benefits will be reversed and remanded for reconsideration.  As explained above, the Commissioner must reconsider the assessment of Ms. Wanserski's migraine headaches and her credibility.

The articulation of the reconsideration of Ms. Wanserski's migraine headaches should specify the evidence's meaning regarding her headache symptoms and resulting functional limitations, separately from her symptoms resulting from her back and other impairments.  General comments regarding lack of evidence of symptom exacerbation, demeanor during examinations, and conservative and sparse treatments, should be avoided in the reconsideration articulation.  The reconsideration should also ensure that adequate medical opinion supports any medical judgments, such as the meaning of an absence of abnormalities on a scan, absence of evidence of symptom exacerbation, and whether the course of treatments were conservative or sparse.

If the Commissioner again relies on Ms. Wanserski's demeanor of not being in "acute distress" during examinations, then she must determine and explain the meaning of that phrase.  If the Commissioner again relies on an inconsistency between Ms. Wanserski's October 15, 2010 indication of wrist and hand symptoms, (R. 381), and her contemporaneous representation of being asymptomatic, then she must cite the location

in the record where Ms. Wanserski's representation appears and assess her argument that the representation was limited to symptoms at rest.

**DONE this date:**  09/28/2015

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.